2001–NMSC–030

33 P.3d 1

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**JAVIER M., Defendant–Petitioner.**

No. 26,593.

Supreme Court of New Mexico.

Sept. 26, 2001.

5

Patricia Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Plaintiff–Respondent.

Phyllis H. Subin, Chief Public Defender, Carolyn R. Glick, Assistant Appellate Defender, Santa Fe, NM, for Defendant–Petitioner.

## OPINION

BACA, Justice.

{1} The Child, Javier M., appeals his adjudication for minor in possession of alcoholic beverages contrary to NMSA 1978, § 60–7B–1(C) (1998) ("It is a violation of the Liquor Control Act for a minor to ... possess or permit himself to be served with alcoholic beverages."). The Child asserts that the incriminating statements he made to a police officer while he was detained and not free to leave were obtained in violation of NMSA 1978, § 32A–2–14 (1993). Hence, the Child argues that his statements should not have been admitted as evidence to support his adjudication. We granted certiorari pursuant to Rule 12–502 NMRA 2001 to address whether Section 32A–2–14 provides children with broader rights than those guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After careful analysis, we find that Section 32A–2–14 evinces a legislative intent to expand the rights of children beyond those embodied in *Miranda* jurisprudence. Thus, we conclude that a child need not be under custodial interrogation in order to trigger the protections of the statute. Instead, we find that the protections are triggered when a child is subject to an investigatory detention. Therefore, Section 32A–2–14 requires that, prior to questioning, a child who is detained or seized and suspected of wrongdoing must be advised that he or she has the right to remain silent and that anything said can be used in court. If a child is not advised of the right to remain silent and warned of the consequence of waiving that right, any statement or confession obtained as a result of the detention or seizure is inadmissible in any delinquency proceeding. *See* § 32A–2–14(D). In the present case, since Javier M. was subject to an investigatory detention and not advised of his right to remain silent, we hold that the incriminating statements he made in response to police questioning are inadmissible and should not have been used to support the Children's Court's finding of delinquency. Accordingly, we reverse the Child's adjudication.

### I.

{2} On or about September 17, 1999, at approximately 2:00 a.m., Officer Helton and his partner were dispatched to an apartment in Hobbs, New Mexico, in response to a loud music complaint. As the officers approached the building, they could hear loud music coming from inside the apartment and observed a female sitting on the stairwell outside the open door of the apartment. When the female saw the officers approaching, she yelled "Five O" (*slang for police*), ran into the apartment, and closed the door. The music was turned off and as the officers approached they could hear people "scuffling" around inside. Officer Helton also testified that he

could smell alcohol and marijuana coming from inside the apartment. The officers knocked on the apartment door, but no one answered. They called for backup and continued to wait outside the apartment for approximately twenty minutes until someone answered the door. When the door was finally opened, Officer Helton testified that he could smell a stronger odor of alcohol and marijuana and saw several empty beer cans around the apartment. There were approximately ten to fifteen individuals inside. Officer Helton, his partner, and other officers who had arrived,[1] entered the apartment and began separating those individuals who were under eighteen from the adults. The officers determined that all of the individuals who were seventeen and younger would receive citations for curfew violations and be taken home.[2]

{3} Officer Helton first had contact with the Child, Javier M., in the living room of the apartment. The Child was sitting on the couch and neither appeared to be intoxicated nor possessed any beer or other alcoholic beverage. Officer Helton testified, however, that he detected the smell of alcohol on the Child's breath or clothing. In Officer Helton's opinion, there was no question that the Child had consumed alcohol. Officer Helton then asked the Child to step outside onto the stairwell of the apartment. Once on the stairwell, the officer asked the Child his name, his age, and whether he had consumed any alcohol. The Child answered the officer's questions and admitted that he had consumed two beers. Officer Helton issued the Child citations for violating the curfew ordinance and for minor in possession of alcohol. The officer did not recall in what order he asked the Child the questions or which citation he issued first. After the Child was issued the citations he was taken home by another officer.

{4} Officer Helton testified that once contact was made at the apartment, the Child was not free to leave and would not be released until he was taken to his home and a parent or guardian could be contacted. The officer, however, did not recall telling the Child that he was not free to leave. At no time was the Child placed under formal arrest, given *Miranda* warnings, advised of his basic rights pursuant to Section 32A–2–14(C), or asked to waive his rights.

{5} The Child was fifteen years old at the time of the incident. A Petition was filed in Children's Court alleging a violation of Section 60–7B–1C, minor permitting himself to receive and be served alcoholic beverages. The Child filed a motion to suppress his statements admitting that he had consumed alcohol, arguing that the officer interrogated him prior to giving him *Miranda* warnings and prior to advising him of his basic rights under the Children's Code. Following the hearing on the motion, the Children's Court concluded that the Child's *Miranda* rights were not violated because the protections of *Miranda* were not triggered since the Child was not subject to custodial interrogation. The Child was thereafter found to be delinquent by a special master and committed to a youth facility for one year. The Child appealed the finding of delinquency to the Court of Appeals, asserting that his statements should not have been admitted as evidence to support his delinquency since the officer did not advise him of his basic rights pursuant to Section 32A–2–14(C) of the Children's Code. *See State v. Javier M.*, NMCA 21,568, slip op. (Sept. 20, 2000).

{6} The Court of Appeals agreed with the Children's Court and held that there was "no violation of the Child's right to *Miranda* warnings as he was never in custody and there was no custodial interrogation." *Id.* at 1–2. Moreover, the court rejected the Child's argument that Section 32A–2–14(C) required that a child suspected of a crime must be given *Miranda* warnings even if the child is not in custody or under arrest. *Id.* at 2. Instead, the Court of Appeals held that

---

1. It is unclear from the record how many officers arrived on the scene after Officer Helton and his partner called for backup.

2. At the time of the incident, Hobbs Police Department was enforcing the Hobbs curfew ordinance. Since the incident, such curfew ordinances have been declared unconstitutional. *See generally ACLU v. City of Albuquerque*, 1999–NMSC–044, ¶ 19, 128 N.M. 315, 992 P.2d 866.

Section 32A–2–14 "is really nothing more than a codification of *Miranda* ... [and][t]hus, there is no requirement that the child be given *Miranda* warnings when the police initiate contact and are trying to determine whether there has been a violation of law." *Id.* The Child sought certiorari in this Court.

## II.

{7} The Child presents two issues on appeal in this Court. First, the Child asserts that Section 32A–2–14(C) of the Children's Code "requires that a child be given *Miranda* warnings before being questioned regarding suspected delinquent activity even if the child is not under arrest." Alternatively, the Child argues that even if the Children's Code does not provide him with greater protection than is afforded under *Miranda,* under a pure *Miranda* analysis the Child's statements should have been suppressed because he was subject to custodial interrogation without first being admonished of his constitutional rights under *Miranda.* The State argues that the Child failed to preserve these issues for appeal and, therefore, requests that this Court decline review of this case.

{8} Initially, the State asserts that the Child failed to adequately preserve whether Section 32A–2–14(C) provides greater protection to juveniles because the Child merely cited both *Miranda* and Section 32A–2–14 without arguing that there was any distinction between them. As support for its argument, the State cites *State v. Gomez,* 1997–NMSC–006, ¶ 22, 122 N.M. 777, 932 P.2d 1, and *State v. Paul T.,* 1999–NMSC–037, ¶ 13, 128 N.M. 360, 993 P.2d 74. Unlike the present case however, the defendants in *Gomez* and *Paul T.* sought greater constitutional protection of their individual liberties under the New Mexico Constitution than would be available under the federal Constitution. In contrast, the Child in the instant case does not seek greater constitutional protection under our state constitution, but instead simply asserts that the Legislature, by enacting Section 32A–2–14(C), intended to provide children with broader rights under the statute. Therefore, the Child's claim is

not subject to the more stringent preservation requirement required by *Gomez.* 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1 (holding that when a party seeks greater protection under the state constitution, the party must also assert in the trial court that "the state constitutional provision at issue should be interpreted more expansively than the federal counterpart *and* provide reasons for interpreting the state provision differently from the federal provision"). Instead, the Child is subject to our general preservation requirement as set forth in Rule 12–216(A) NMRA 2001 that requires only that a "ruling or decision by the district court was fairly invoked."

{9} The facts and arguments presented in the Children's Court were sufficient to meet the basic requirements of Rule 12–216(A). In the Child's motion to suppress, which was timely filed in the Children's Court, the Child asserted that: (1) "the police officer interrogated Child prior to giving the *Miranda* warnings;" *and* (2) "the police officer interrogated Child prior to giving the Children[']s Basic Rights." Moreover, during Officer Helton's testimony, the officer was asked whether he had advised the child of his *Miranda* rights *or* of his basic rights under the Children's Code. Because the Child cited both *Miranda* and Section 32A–2–14 as grounds for suppressing the Child's statements, we conclude that the Children's Court was sufficiently alerted to the nature of the claimed error and was able to issue an intelligent ruling. *See State v. Lucero,* 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App. 1986) ("[T]he objection must be sufficiently timely and specific to apprise the trial court of the nature of the claimed error and to invoke an intelligent ruling by the court."). Therefore, we find that the issues presented and briefed in this Court were properly preserved for appellate review.

{10} The State also argues that the Child abandoned the issue of whether the Child was in "custodial interrogation" under *Miranda* since he waived the argument in the Court of Appeals and did not specifically seek certiorari with respect to that issue in this Court. We recognize that on appeal the

Child primarily rests the error in this case on the lower court's refusal to find that Section 32A–2–14(C) provides greater protection to children by eliminating *Miranda's* custodial interrogation requirement. We also recognize that Rule 12–502(C)(2) NMRA 2001 states that "only the questions set forth in the petition will be considered by the Court." However, in order to fully analyze whether Section 32A–2–14 provides greater protection than is mandated by *Miranda*, we must consider the minimum protections available to the Child. Therefore, the issue of whether the Child is subject to custodial interrogation is a foundational issue which is integral to a complete and thorough analysis of the specific question presented in the petition for writ of certiorari. Consequently, we do not expand our inquiry beyond the limited issue presented or broaden our review in contradiction to Rule 12–502(C)(2). Accordingly, we review in full the issues briefed by the Child which include both the underlying constitutional question of whether the Child was subject to custodial interrogation and whether Section 32A–2–14 provides greater protection to children than is mandated by *Miranda*.

### III.

{11} In this case, we are asked to evaluate the admissibility of the Child's statements made in response to police questioning. We begin our analysis with the United States Supreme Court's decision in *Miranda*. Only after assessing the minimum constitutional guarantees available to the Child under *Miranda* can we adequately interpret Section 32A–2–14 and determine what, if any, additional protections are available to the Child under the statute.

### A.

{12} The Child challenges the admissibility of his statements on the basis of the Fifth Amendment, claiming that his privilege against self-incrimination was violated when Officer Helton questioned him without first advising him of his rights under *Miranda*. The Fifth Amendment mandates that, "No person shall be . . . *compelled* in any criminal case to be a witness against himself. . . ."

U.S. Const. amend. V (emphasis added). "[T]he privilege has consistently been accorded a liberal construction." *Miranda*, 384 U.S. at 461, 86 S.Ct. 1602. Therefore, " 'a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise.' " *Id.* at 462, 86 S.Ct. 1602 (quoting *Ziang Sung Wan v. United States*, 266 U.S. 1, 14, 45 S.Ct. 1, 69 L.Ed. 131 (1924)).

{13} Generally, "the constitutional privilege against self-incrimination is available only if it is invoked as the ground for refusing to speak." *State v. Gutierrez*, 119 N.M. 618, 620, 894 P.2d 395, 397 (Ct.App. 1995). The United States Supreme Court has long acknowledged that:

The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.

*Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943)). Hence, the Fifth Amendment neither prohibits the government from asking questions nor does it forbid an individual from volunteering incriminating statements. *See id.* The Constitution only prohibits government practices and procedures that compel individuals to incriminate themselves. Therefore, as a general rule individuals are not deemed to be "compelled" to speak in violation of the Fifth Amendment unless the individual invokes the privilege, refuses to answer, and is thereafter forced to answer. *See Gutierrez*, 119 N.M. at 620, 894 P.2d at 397.

{14} The United States Supreme Court in *Miranda*, however, recognized that there are certain situations where the circumstances surrounding the asking of a question by law enforcement are so inherently coercive that any answer is "compelled" under the Fifth Amendment. *See id.* at 621, 894 P.2d at 398

(recognizing that *Miranda* is an "exception[ ] to the general rule that the privilege is not available unless invoked as a ground for refusal to answer"); *see generally Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Court identified that there exist such compelling pressures when a person is subject to custodial police interrogation. *See Miranda*, 384 U.S. at 467–68, 86 S.Ct. 1602. Because of the compelling pressures present during custodial police interrogation, the Court imposed a prophylactic protection by requiring that suspects be advised of their rights under the Fifth Amendment prior to any questioning. *See id.*

{15} Custodial interrogation occurs when "[a]n individual [is] swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion ... [so that the individual feels] under compulsion to speak." *Id.* at 461, 86 S.Ct. 1602. The Court has reasoned that "custodial police interrogation, by its very nature, isolates and pressures the individual," *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), and that it "convey[s] to the suspect a message that he has no choice but to submit to the officers' will and to confess," *Murphy*, 465 U.S. at 433, 104 S.Ct. 1136. To ensure that accused or suspected individuals do not speak out of compulsion, *Miranda* held that the Fifth Amendment requires that prior to questioning, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602; *see Dickerson*, 530 U.S. at 439, 120 S.Ct. 2326 (holding that the procedural safeguards pronounced in *Miranda* are constitutionally mandated). If an individual is not apprised of his rights, the Fifth Amendment prohibits the use of any "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 ("[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]."). *Id.* at 479, 86 S.Ct. 1602.

Therefore, the *Miranda* protections and the notion of "custodial interrogation" are inextricably intertwined.

{16} In 1967, a year after *Miranda* was decided, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination is similarly applicable to juveniles. *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Therefore, at a minimum, if the Child in this case was subject to custodial interrogation, the officer was constitutionally required to advise the Child of his rights under *Miranda* and obtain a voluntary, knowing, and intelligent waiver.

**B.**

{17} The Child contends that he was subject to custodial interrogation because: (1) as Officer Helton testified, the Child was not free to leave until he was released into the care of his parent or guardian; (2) there were numerous officers at the scene; (3) "[a]ll of the persons under seventeen were lined up on the balcony where several officers were keeping control of them and issuing them citations;" and (4) in questioning the Child, Officer Helton knew that his questions were reasonably likely to elicit an incriminating response from the Child. The State argues that the Child was not entitled to *Miranda* warnings because he was subject only to a brief investigatory detention which did not rise to the level of custodial interrogation. Whether a person is subject to custodial interrogation and entitled to the constitutional protections of *Miranda* is a mixed question of law and fact. *United States v. Galindo–Gallegos*, 255 F.3d 1154, 1154 (9th Cir.2001). "[W]e review mixed questions of law and fact de novo, particularly when they involve constitutional rights." *State v. Hernandez*, 1997–NMCA–006, ¶ 18, 122 N.M. 809, 932 P.2d 499.

{18} An individual is subject to custodial interrogation when he or she lacks the freedom to leave to an extent equal to formal arrest. *See California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The lack of freedom to leave, however, is not the only fact that renders an

interrogation custodial. *State v. Cooper,* 1997–NMSC–058, ¶ 36, 124 N.M. 277, 949 P.2d 660. Additionally,

> *Miranda* was focused upon the private and secret interrogation of a suspect in an isolated environment completely controlled by law enforcement officials. [Citation omitted]. Isolation is the key aspect of the custodial interrogation under *Miranda.* [Citation omitted]. "In this setting, the police have immediate control over the suspect-they can restrain him and subject him to their questioning and apply whatever psychological techniques they think will be most effective." [Citation omitted]. It is much easier, in such a setting, for investigators, intent upon obtaining a confession, to crush a suspect's will.

*Id.* (quoting *United States v. Mesa,* 638 F.2d 582, 586 (3rd Cir.1980)). Thus, it is the lack of the freedom to leave, as well as isolation, which implicates the protections of the Fifth Amendment.

{19} In contrast, investigatory detentions, which are Fourth Amendment seizures of limited scope and duration, are generally public, temporary, and substantially less coercive than custodial interrogations. Therefore, investigatory detentions do not implicate the Fifth Amendment in the same way as custodial interrogations. *See Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Police officers are not constitutionally mandated to forewarn citizens subject to investigatory detentions that they have the right not to answer the officer's questions. *See id.* The Fourth Amendment permits a police officer to approach an individual and ask him a moderate number of questions "in order to investigate possible criminal behavior when the officer has 'a reasonable suspicion that the law has been or is being violated.'" *State v. Taylor,* 1999–NMCA– 022, ¶ 7, 126 N.M. 569, 973 P.2d 246 (quoting *State ex rel. Taxation & Revenue Dep't, Motor Vehicle Div. v. Van Ruiten,* 107 N.M. 536, 538, 760 P.2d 1302, 1304 (Ct.App.1988)). During such investigatory detentions, the detainee is not obliged to respond and, therefore, there is no violation of the privilege against self-incrimination. *Berkemer,* 468 U.S. at 439, 104 S.Ct.

3138. For instance, the Fourth Amendment permits an officer to pull a motorist over to investigate a possible traffic violation. When a motorist is pulled over for a traffic stop, the motorist is subject only to an investigatory detention because the stop is presumptively temporary and brief. *Id.* at 437, 104 S.Ct. 3138. The motorist expects that he will only be obliged to spend a short period of time answering questions and then be allowed to continue on his way. *Id.* The temporariness of such a stop is different from a station house interrogation which "is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Id.* at 437–38, 104 S.Ct. 3138. Moreover, a traffic stop is typically public and therefore "reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements." *Id.* at 438, 104 S.Ct. 3138. Because the atmosphere surrounding such investigatory detentions is not so inherently coercive that the detainee feels compelled to speak, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" *Id.* at 440, 104 S.Ct. 3138.

{20} We agree that the Child in this case was not free to leave at the time that Officer Helton questioned him; however, because the detention was temporary, non-coercive, and public we find that the Child was subject only to an investigatory detention and not custodial interrogation. First, Officer Helton reasonably suspected that the Child had committed or was committing a crime. The Child was present at an apartment where it appeared that the occupants of the apartment, by closing the door when the officers approached and not answering the door for approximately twenty minutes, were attempting to conceal some activity from the approaching officers. Additionally, once the officers gained access they could smell alcohol and marijuana and observed empty beer cans around the apartment. Although Officer Helton did not observe the Child with any alcoholic beverages, the officer specifically smelled alcohol on the Child's person. These instances amount to "specific articulable facts, together with rational inferences

from those facts, that, when judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring." *Taylor*, 1999–NMCA–022, ¶ 7, 126 N.M. 569, 973 P.2d 246 (internal quotation marks and citation omitted). Accordingly, the officer reasonably suspected that the Child had committed or was committing a crime and, therefore, it was permissible for the officer to briefly detain the Child to investigate the situation further by asking the Child a few questions to confirm or dispel his suspicions. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138.

{21} The detention of the Child did not rise to the status of a custodial interrogation. At the outset, the fact that the Child was issued a citation during the detention does not elevate the investigatory seizure to custodial interrogation. *See Taylor*, 1999–NMCA–022, ¶ 9, 126 N.M. 569, 973 P.2d 246 ("[The officer] could have cited Defendant . . . without actually arresting him."). Moreover, there is nothing in the record to indicate that the Child was overpowered by police presence. It is true that there were numerous officers at the apartment, but Officer Helton was the only officer who questioned the Child directly. Thus, the Child's detention was not overly "police dominated" as is the case in custodial interrogation. *See Berkemer*, 468 U.S. at 438, 104 S.Ct. 3138 ("The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability."); *cf. Murphy*, 465 U.S. at 433, 104 S.Ct. 1136 ("[C]ustodial arrest thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner.' ") (quoting *Miranda*, 384 U.S. at 457, 86 S.Ct. 1602).

{22} Likewise, it appears from the record that only a short period of time elapsed between the initial contact with the Child and the issuing of the citation, after which the Child was released into the care of another officer who took the Child home. *See Berkemer*, 468 U.S. at 437, 104 S.Ct. 3138. We recognize that Officer Helton testified that the Child was not free to leave until he was escorted home by law enforcement; however,

at no point during the exchange between Officer Helton and the Child was the Child ever informed that his detention would not be temporary. *See id.* at 442, 104 S.Ct. 3138 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time. . . ."). Additionally, the police further detained the Child, not because he was under formal arrest, but because, according to Officer Helton, the Hobbs curfew ordinance in effect at the time required the police to assume a caretaker role over the Child until the Child could be released into the care and custody of his parent or guardian. This continued detention was to ensure the safety of the Child and was not adversarial as is the case when an individual is in custodial interrogation. *See ACLU v. City of Albuquerque*, 1999–NMSC–044, ¶ 18, 128 N.M. 315, 992 P.2d 866 ("The stated purposes of the Curfew are to protect minors from each other and others, to enforce parental control, and to protect the public from juvenile criminal activities.").

{23} Last, because the detention occurred in the presence of ten to fifteen other suspects and the questioning occurred on the stairwell of an apartment complex, it was sufficiently public to quell any potential illegitimate tactics the police may have used to elicit self-incriminating statements from the Child. There is nothing in the record to indicate that the "balcony" was confined and isolated away from the public. In fact, the area where the Child was questioned by Officer Helton was continuously referred to as a "stairwell," which was not enclosed. Additionally, the Child was questioned in the presence of ten to fifteen other individuals. "Where officers apprehend a substantial number of suspects and question them in the open prior to arrest, this is ordinarily . . . not custodial questioning. . . ." *United States v. Galindo–Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001) (holding that the presence of large numbers of other suspects made stop "public" for purposes of *Miranda* custody analysis). Therefore, we find that although the Child was not free to leave, he was not in custodial interrogation at the time Officer Helton inquired as to whether the Child had

consumed any alcohol. Since the Child was not subject to custodial interrogation, we hold that the officer was not required to "*Mirandize*" the Child before questioning him. Therefore, under a pure constitutional analysis, the Child's statements were admissible and properly used as a basis for his adjudication.

### IV.

{24} As the Child was not entitled to the protections guaranteed by *Miranda*, we turn now to the Children's Code to determine whether the Code provides the Child with any additional protection. "[W]hile the federal constitution provides a minimum level of protection below which the states may not descend, states remain free to provide greater protection." *Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 375 (S.D.N.Y.1998) (recognizing that as a matter of state law, a state could require greater protection of liberty interest than the minimum adequate to survive scrutiny under the federal Constitution); *Morgan v. Rabun*, 128 F.3d 694, 697 (8th Cir.1997) ("State law ... may recognize more extensive liberty interests than the Federal Constitution."). Hence, it is completely within the Legislature's authority to provide greater statutory protection than accorded under the federal Constitution.

{25} In order to determine whether the Legislature intended to provide greater protection to children with respect to the admissibility of a child's statement, we must construe Section 32A–2–14 which governs the basic rights of juveniles in delinquency matters. *See Doe v. State*, 100 N.M. 579, 581, 673 P.2d 1312, 1314 (1984). In interpreting this statute, three necessary issues must be addressed. First, we must determine whether the statute is merely a codification of *Miranda*, requiring that a child be in custodial interrogation to trigger the protections of the statute. Second, if the statute is not a codification of *Miranda*, but an act by the Legislature to grant children greater statutory protection, we must assess at what point during a police/child encounter the protections of the statute are triggered. Last, we must define the scope of the protections afforded under the statute so that both children and law enforcement are aware of their rights and obligations. We review these issues de novo. *See State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995) (recognizing that the standard of review for issues of statutory interpretation and construction is de novo).

### A.

{26} As a threshold inquiry, we must first determine whether the Legislature in enacting Section 32A–2–14, intended simply to codify the Court's holding in *Miranda* or whether they intended to provide greater statutory protection to children when they are questioned by law enforcement. If the statute is merely a codification of *Miranda*, the Child's statements were properly admitted as a basis for the Children's Court's finding of delinquency because the Child was not in custodial interrogation, and therefore not entitled to *Miranda* warnings at the time he was questioned by Officer Helton. To establish whether the Legislature intended to provide additional protections to children than are afforded under *Miranda*, we look to the plain language of the statute, as well as the history and evolution of Section 32A–2–14. *Draper v. Mountain States Mut. Cas. Co.*, 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994).

### 1.

{27} Generally, in order to be constitutionally admissible a suspect's statement must be voluntary and must not have been obtained through compulsion or coercion. *See, e.g., Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326 (recognizing that a statement or confession made during custodial interrogation is constitutionally admissible only when warnings are given *and* the statements are shown to have been knowingly, intelligently, and voluntarily made); *Cooper*, 1997–NMSC–058, ¶¶ 31–32, 124 N.M. 277, 949 P.2d 660 ("[I]t is possible for a suspect to voluntarily waive his or her *Miranda* rights and still make an involuntary confession because police used fear, coercion, hope of reward, or some other improper inducement."). Section 32A–2–14 states in pertinent part:

(A) A child subject to the provisions of the Delinquency Act [this article] is entitled to the same basic rights as an adult, except as otherwise provided in the Children's Code [this chapter].

. . .

(C) No person subject to the provisions of the Delinquency Act who is *alleged* or *suspected* of being a delinquent child shall be *interrogated* or *questioned* without first advising the child of the child's *constitutional rights* and securing a knowing, intelligent and voluntary waiver.

(D) Before any statement or confession may be introduced at a trial or hearing when a child is alleged to be a delinquent child, the state shall prove that the statement or confession offered in evidence was elicited only after a knowing, intelligent and voluntary waiver of the child's rights was obtained.

(E) In determining whether the child knowingly, intelligently and voluntarily waived the child's rights, the court shall consider the following factors:

(1) the age and education of the respondent;

(2) *whether or not the respondent is in custody;*

(3) the manner in which the respondent was advised of his rights;

(4) *the length of questioning and circumstances under which the respondent was questioned;*

(5) the condition of the quarters where the respondent was being kept at the time he was questioned;

(6) the time of day and the treatment of the respondent at the time that he was questioned;

(7) the mental and physical condition of the respondent at the time that he was questioned; and

(8) whether or not the respondent had the counsel of an attorney, friends or relatives at the time of being questioned.

(Emphasis added.). We read this legislation in its entirety and "construe each part in connection with every other part to produce a harmonious whole" and find that taken together, Subsections (C), (D), and (E) adopt the general rule governing admissibility of a suspect's statements. *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). Subsection (C) provides children with the right to be advised of their constitutional rights when they are alleged or suspected of delinquent behavior. *See* Section 32A–2–14(C). Subsection (D) provides the remedy for a violation of the rights granted in Subsection (C) and places the burden on the State to prove that a statement obtained from the child was voluntary. *See* § 32A–2–14(D). Finally, Section 32A–2–14(E) is " 'essentially a codification of the totality-of-circumstances test' applied in evaluating a waiver of constitutional rights by an adult, though emphasizing some of the circumstances that may be particularly relevant for a juvenile." *State v. Martinez,* 1999–NMSC–018, ¶ 18, 127 N.M. 207, 979 P.2d 718 (quoting *State v. Setser,* 1997–NMSC–004, ¶ 13, 122 N.M. 794, 932 P.2d 484). We must next analyze the plain language of the statute to determine whether the Legislature merely codified the constitutional rule or whether additional statutory protections were intended.

{28} "The starting point in every case involving the construction of a statute is an examination of the language utilized by [the Legislature]." *State v. Wood,* 117 N.M. 682, 685, 875 P.2d 1113, 1116 (Ct.App.1994). Words in the statute should be given their "ordinary meaning unless the legislature indicates a different intent." *State v. Rodriguez,* 101 N.M. 192, 194, 679 P.2d 1290, 1292 (Ct.App.1984). The Child asserts that the unambiguous plain language of Section 32A–2–14 confirms that the Legislature did not intend to codify *Miranda.* We agree.

{29} In looking to the plain language of Section 32A–2–14(C), we conclude that a child need not be subject to *custodial interrogation* in order to be afforded the right to be advised of his or her constitutional rights prior to police questioning. Instead of using *Miranda* triggering terms such as "custody" or "custodial interrogation," the Legislature used much broader terms, such as, "alleged," "suspected," "interrogated," and "questioned." Section 32A–2–14(C). First, "alleged" is a specific legal term which pertains to the time period after which a formal peti-

tion alleging delinquency has been filed in the Children's Court. *See* Black's Law Dictionary 74 (7th ed.1999) (defining "alleged" as "[a]ccused but not yet tried"). Also, the plain meaning of the term "suspected" refers to a period prior to the filing of a petition when a child is believed to have committed a crime or offense but has not yet been formally charged. *See* Webster's Ninth New Collegiate Dictionary 1189 (1985) (defining "suspect" as "to imagine (one) to be guilty or culpable on slight evidence or without proof"); *Weiland v. Vigil*, 90 N.M. 148, 152, 560 P.2d 939, 943 (Ct.App.1977) ("The legislature is presumed to have used no surplus words."). Therefore, "suspected" and "alleged" are two different words with two separate meanings. *See State ex rel. Helman v. Gallegos*, 117 N.M. 346, 355, 871 P.2d 1352, 1361 (1994) ("[E]ach word is to be given meaning."). Under its ordinary meaning, we find that a person can be "suspected" of criminal activity regardless of whether the person is subject to custodial interrogation. Moreover, the term "interrogated" is not synonymous with "custodial interrogation." Rather, "interrogated" generally means express questioning which can be either custodial or investigatory. *See* Black's Law Dictionary 825 (recognizing that interrogation can be either investigatory or custodial; "[t]he formal or systematic questioning of a person ... [usually] of a person *arrested* for *or suspected* of committing a crime") (emphasis added). Last, "questioned" is a very broad term which means "[a] query directed to a witness." *Id.* at 1259. Given the inclusion of these broad terms within Subsection (C), we conclude that the Legislature did not intend to merely codify *Miranda*, but instead intended to provide protection to children in areas outside the narrow context of custodial interrogation.

{30} The factors in Subsection (E) further support the conclusion that custodial interrogation is not a prerequisite to warnings under the statute. For example, Subsection (E)(2) states that in determining whether the Child voluntarily waived his rights, the court should consider "whether or not [the child] is in custody." Section 32A–2–14(E)(2). Additionally, "the length of questioning and circumstances under which [the child] was ques-

tioned" should also be considered. Section 32A–2–14(E)(4). Analyzing Section 32A–2–14 as a whole, we agree that the Legislature would not have included these factors if it intended merely to codify *Miranda* and require custodial interrogation as a predicate to a child being afforded statutory protection. Therefore, although the inclusion of (E)(2) and (E)(4) does not conclusively decide the issue, we agree that these factors lend support to the conclusion that Section 32A–2–14 is not a simple codification of the constitutional rule.

### 2.

{31} Further, the history and evolution of Section 32A–2–14 also support the finding that the Legislature did not intend to merely codify *Miranda*. Although we primarily look to the plain language, we may also consider the history and background of the statute to determine the Legislature's intent. *See Blackhurst*, 106 N.M. at 735, 749 P.2d at 1114; *cf. Vigil v. Thriftway Mktg. Corp.*, 117 N.M. 176, 179, 870 P.2d 138, 141 (Ct.App.1994) ("When dealing with a statute or rule which has been amended, the amended language must be read within the context of the previously existing language, and the old and new language, taken as a whole, comprise the intent and purpose of the statute or rule."). For instance, unlike the modern version of Section 32A–2–14, its 1972 predecessor specifically included the term "custody" in pronouncing when a child must be advised of his or her constitutional rights. *See* 1972 N.M. Laws, ch. 97, § 25(A) (Repealed 1981) ("A child alleged to be a delinquent child or a child in need of supervision shall from the *time of being taken into custody* be accorded *and advised* of the privilege against self-incrimination ....") (emphasis added). When the statute was significantly revised in 1981, however, the term "custody" was omitted. *See* 1981 N.M. Laws, ch. 36, § 21 (codified at NMSA 1978, § 32–1–27) (Repealed 1993). The State argues that it was unnecessary to include the term "custody" in the 1981 and current revision of the statute because the Legislature also included Subsection (A) which did not appear in the 1972 version. Subsection (A) states: "A

child subject to the provisions of the Delinquency Act ... is entitled to the *same basic rights as an adult*, except as otherwise provided in the Children's Code...." Section 32A–2–14(A) (emphasis added). The State asserts that the inclusion of this subsection "is clearly a reference to *Miranda* rights, and that the Legislature had therefore already shown that it intended to apply the whole of *Miranda* jurisprudence to children." According to the State, "[i]f the Legislature intended to apply 'the same basic rights' to children as adults ... no explicit reference to custody is necessary in Subsection (C)." We disagree.

{32} The State's argument is unsupported by the rules of statutory interpretation, the language of the statute, or the history of Section 32A–2–14. Under the State's interpretation of Subsection (A), Subsection (C) would be redundant and unnecessary. In essence, if the Legislature incorporated "the whole *Miranda* jurisprudence" in Subsection (A), there would be no reason for the Legislature to again codify *Miranda* in Subsection (C). The State's interpretation renders Subsection (C) superfluous. This construction is inconsistent with the rules of statutory interpretation since "[a] statute must be construed so that no part of the statute is rendered surplusage or superfluous." *Katz v. New Mexico Dep't of Human Servs., Income Support Div.*, 95 N.M. 530, 534, 624 P.2d 39, 43 (1981). To the contrary, we conclude that the "same basic rights" referred to in Subsection (A) are those basic rights such as the right to be free from unreasonable search and seizure, and the Sixth Amendment right to confront witnesses. *See, e.g.,* 1972 N.M. Laws, ch. 97, § 25(C) and (J). These rights were specifically enumerated in the 1972 pre-

decessor to Section 32A–2–14, but were omitted in the revised and current version, having been replaced by the all-encompassing Subsection (A).[3] Therefore, to give all subsequent subsections of the statute effect, we find that Subsection (C) is an exercise of the Legislature's "except as otherwise provided" authority under Subsection (A).[4] *See* § 32A–2–14(A) ("A child subject to the provisions of the Delinquency Act ... is entitled to the same basic rights as an adult, *except as otherwise provided* ....") (emphasis added). Accordingly, we hold that Subsection (C) is an exception to Subsection (A)'s general recognition that children are "entitled to the same basic rights as adults." *Id.* We conclude Section 32A–2–14 is not a mere codification of *Miranda*, but was intended instead to provide children with greater statutory protection than constitutionally mandated. Therefore, we hold that Section 32A–2–14 does not require that a child be subject to custodial interrogation in order for the protections of the statute to come into force.

**B.**

{33} Because we hold that the statute is not a codification of *Miranda* but an act by the Legislature to grant children greater statutory protection, we must assess at what point during a police/child encounter the protections of the statute are triggered. The Child argues that Section 32A–2–14 requires police officers to advise a child of his or her "constitutional rights" prior to the officer asking any question that is likely to lead to an incriminating response. The State counters that this standard is unworkable and would present a number of practical difficulties which would conflict with the need for

3. The 1972 predecessor to Section 32A–2–14 included the following sections which were omitted in the 1981 and most recent revision of the statute.
    (C) In a proceeding on a petition alleging delinquency or need of supervision:
        ...
    (2) evidence illegally seized or obtained shall not be received in evidence to establish the allegations of a petition against a child over objection; and
        ...
    (J) In a proceeding on a petition, a party is entitled to the opportunity to introduce evi-

dence and otherwise be heard on the party's own behalf and to confront and cross-examine witnesses testifying against the party, and to admit or deny the allegations against the party in a petition.
1972 N.M. Laws, ch. 97, § 25(C) and (J).

4. Consistent with our conclusion, we find that the subsections following Subsection (A) are written specifically to provide added protection to children or to emphasize some circumstances that may be particularly relevant to juveniles. *See, e.g.,* § 32A–2–14(F)–(H).

law enforcement to adequately investigate crime. The State maintains that without custodial interrogation to serve as the basis for requiring law enforcement to give constitutional warnings, an officer would have to advise every child of his or her constitutional rights, including juveniles who have done nothing wrong and who are not suspected of any wrongdoing. We agree that the standard proposed by the Child is unworkable; however, we do not agree that the omission of custodial interrogation from the statute will have the effect of which the State is concerned. Instead, the language of the statute provides a standard to determine when the protections of the statute are triggered which falls between the two extremes proposed and anticipated by the parties.

{34} As a prerequisite to requiring that a child be advised of his or her rights under Subsection (C), the Child must be either "alleged" or "suspected" of being a delinquent child. *See* § 32A–2–14(C) ("No person subject to the provisions of the Delinquency Act who is *alleged* or *suspected* of being a delinquent child shall be *interrogated* or *questioned* without first advising the child of the child's constitutional rights and securing a knowing, intelligent and voluntary waiver.") (emphasis added). As previously stated, "alleged" pertains to a time period after which a formal petition alleging delinquency has been filed in the Children's Court. Therefore, police officers may not question children who have had formal charges filed against them without first advising them of their constitutional rights under the statute. Of significance to this case, however, is the term "suspected." "Suspected" means "to imagine (one) to be guilty or culpable." Webster's Ninth New Collegiate Dictionary 1189. Hence, the statute is also triggered when a child is imagined to be engaged in some wrongdoing. Despite the State's contention, therefore, the statute is not triggered when officers are questioning eyewitnesses and other juveniles who could not be suspected of any delinquent behavior.

{35} Furthermore, it is clear, because an officer's suspicion will almost always cause the encounter with the child to be an investigatory detention, that an objective standard would be used in evaluating whether the child is suspected of delinquent activity and therefore entitled to the statute's protections. We believe that determining whether a child is "suspected" of wrongdoing by evaluating the subjective intentions of the officer poses evidentiary difficulty and can be subject to abuse. *See, e.g., Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (recognizing that there is evidentiary difficulty in determining subjective intent); *Massachusetts v. Painten,* 389 U.S. 560, 565, 88 S.Ct. 660, 19 L.Ed.2d 770 (1968) (White, J., dissenting) ("[S]ending ... courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources."). Therefore, we find that whether a child is "suspected" of wrongdoing should be measured by an objective standard. Such an objective standard already exists in our law.

{36} Police/citizen encounters fall within one of three categories. *State v. Jason L.,* 2000–NMSC–018, ¶ 34, 129 N.M. 119, 2 P.3d 856 (Baca, J., dissenting); *United States v. Hill,* 199 F.3d 1143, 1147 (10th Cir.1999). At one end of the spectrum are consensual encounters which do not generally implicate any constitutional protections. *See Hill,* 199 F.3d at 1147. On the other end are arrests, which are the most intrusive of seizures, and generally trigger both the Fourth Amendment and *Miranda* protections. *See id.* In between are investigatory detentions, or *Terry* stops, which are "Fourth Amendment seizures of limited scope and duration and must be supported by reasonable suspicion of criminal activity[.]" *Id.* We find that, by including the term "suspected" in Section 32A–2–14(C) to describe when the statute's protections are triggered, the Legislature intended to draw the line at investigatory detentions.

{37} Most often, when an officer approaches a child to ask the child questions because the officer "suspects" the child of delinquent behavior, the officer is performing an investigatory detention. The Fourth Amendment allows an officer who has reasonable articulable suspicion of wrongdoing to briefly detain individuals whom he suspects of criminal activity and ask them ques-

tions in an attempt to confirm or dispel his suspicions. *Taylor*, 1999–NMCA–022, ¶ 7, 126 N.M. 569, 973 P.2d 246; *see State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994). Given a child's possible immaturity and susceptibility to intimidation, a child who is subject to an investigatory detention may feel pressures similar to those experienced by adults during custodial interrogation. Accordingly, using investigatory detentions as the point at which the statute's protections are triggered furthers the Legislature's intent to be:

> consistent with the protection of the public interest, to remove from children committing delinquent acts the adult consequences of criminal behavior, but to still hold children committing delinquent acts accountable for their actions *to the extent of the child's age, education, mental and physical condition, background and all other relevant factors* [.]

NMSA 1978, § 32A–2–2(A) (1993) (emphasis added); *see In re Doe*, 88 N.M. 481, 482, 542 P.2d 61, 62 (Ct.App.1975) ("Those sections of the Children's Code [referring to a child's constitutional and statutory rights] must be read in light of the legislative purposes expressed in the Code.").

{38} In addition to conforming to the language and purpose of Section 32A–2–14, the "reasonable suspicion" standard places no additional burden on either the courts or law enforcement since the standard is already used to assess whether law enforcement has conformed to the protections of the Fourth Amendment. Hence, it is simple to require that officers who have reasonable suspicion to detain a child, also advise the child of his or her "constitutional rights" under Section 32A–2–14 prior to questioning. Therefore, we hold that the protections of the statute are triggered in two circumstances: (1) after formal charges have been filed against a child; and (2) when a child is seized pursuant to an investigatory detention and not free to leave.

{39} Although we conclude that the Legislature intended to provide children with greater statutory protection by requiring that law enforcement advise children of their constitutional rights prior to questioning dur-

ing an investigatory detention, we do not find that the Legislature intended to hamper the traditional function of police officers in investigating crime. Accordingly, we reject the Child's proposed standard of requiring warnings whenever an officer asks a question which is likely to lead to an incriminating response. Such a standard unduly burdens a police officer's required duties. For example, under the Child's proposed standard, a preliminary question pertaining to a child's identity or age may lead to an incriminating response and therefore be prohibited without first advising the child of his or her "constitutional rights." *See, e.g., State v. Loo*, 94 Hawai'i 207, 10 P.3d 728, 730 (2000) (illustrating a circumstance in which a minor responding to an officer's inquiry as to his age revealed that the minor had violated the state statute prohibiting a minor from being in possession of alcohol). Police officers must be free to ask a child questions that are related to the officer's administrative concerns. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (holding that the defendant's answers to questions regarding his name, address, height, weight, eye color, date of birth, and current age posed to him during custodial interrogation were admissible because the questions fell within a "routine booking questions" exception which exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services). The "likely to lead to an incriminating response" standard would be impractical since it would essentially prohibit officers from ascertaining whether a particular individual requires special attention as a juvenile under the Children's Code. *See Doe*, 100 N.M. at 582–83, 673 P.2d at 1315–16 (holding that the predecessor to Section 32A–2–14 is not applicable to threshold questioning). Therefore, we reject the Child's proposed standard and conclude that a child is not entitled to any protections under the statute when an officer asks administrative questions such as those pertaining to a child's name or age.

{40} The statute's protections also do not apply when a child, not subject to investigatory detention, answers general

on-the-scene questions or when the child makes a voluntary statement. "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." *Miranda*, 384 U.S. at 477–78, 86 S.Ct. 1602. As such, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected" by our interpretation of Section 32A–2–14. *Id.* at 477, 86 S.Ct. 1602. Moreover, volunteered statements of any kind are also not subject to the protections of Section 32A–2–14 since such statements are generally not in response to any "questioning" or "interrogation." *See Doe*, 100 N.M. at 581, 583, 673 P.2d at 1314, 1316 (concluding that a child's statement admitting that he had shot a rifle after police picked up the rifle was volunteered and therefore admissible). We hold, therefore, that the statute does not require that officers give children constitutional warnings prior to: (1) questions pertaining to a child's age or identity; (2) general on-the-scene questioning; or (3) volunteered statements made by a child. The statute only protects against a child's statements which are made during an investigatory detention in response to a police officer's questioning that could not be mere administrative questions and that is intended to confirm or dispel the officer's suspicions that the child is or has committed a delinquent act. Since the Child in this case was subject to investigatory detention, Section 32A–2–14(C) required Officer Helton to advise the Child of his "constitutional rights" prior to questioning.

## C.

{41} This brings us to our final task of defining what "constitutional rights" a child must be advised of under Section 32A–2–14(C) when a child is subject to an investigatory detention. Both the State and the Child assume that, by requiring that a child be advised of his or her "constitutional rights" prior to being interrogated or questioned, the Legislature intended the term "constitutional rights" to be synonymous with *Miranda* warnings. *See* § 32A–2–14(C); *see, e.g., Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 (holding that prior to questioning a person

must be warned that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed."). However, since the Legislature intended to apply the protections of the statute beyond the narrow context of custodial interrogations, we do not assume that the term "constitutional rights" in Subsection (C) refers to the required warnings enumerated in *Miranda*. Instead, we hold that pursuant to Section 32A–2–14, children who are subject to investigatory detentions are statutorily entitled only to be warned of their right to remain silent and that anything they say can be used against them.

{42} In the absence of custodial interrogation an officer is not constitutionally mandated to give any warnings. Custodial interrogation was the essential predicate to the Court's decision in *Miranda*. *See State v. Nieto*, 2000–NMSC–031, ¶ 22, 129 N.M. 688, 12 P.3d 442 (holding that the general right to receive *Miranda* warnings attaches only during custodial interrogation); *see also State v. Chambers*, 84 N.M. 309, 312, 502 P.2d 999, 1002 (1972) (holding that statements made prior to any type of custodial interrogation within the meaning of *Miranda* are voluntary). The inherently coercive atmosphere present during custodial interrogation provides the constitutional justification for mandating that suspects be given warnings, advising them of their right to remain silent and their right to counsel. *See, e.g., Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326 (concluding that the "coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself") (internal quotation marks omitted). Absent custodial interrogation the constitutional procedural safeguards pronounced in *Miranda* do not apply. Therefore, in enacting Section 32A–2–14(C), the Legislature is providing juveniles with a separate statutory right, not codifying a constitutional mandate. We must now assess the

scope of this statutory right when a child is in an investigatory detention.

{43} Although not constitutionally entitled to *Miranda* warnings in the absence of custodial interrogation, individuals continue to possess the constitutional privilege against self-incrimination during investigatory detentions. The Fifth Amendment privilege against self-incrimination is continuously present although at most times remaining un-invoked. For instance, the privilege releases an individual from the obligation to answer questions posed by law enforcement during an investigatory detention. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138 (recognizing that a person detained pursuant to an investigatory detention is not obliged to respond to police questioning). However, if questioning persists and the individual desires the protection of the privilege, " 'he must claim it or he will not be considered to have been 'compelled' within the meaning of the [Fifth] Amendment.' " *Murphy*, 465 U.S. at 427, 104 S.Ct. 1136 (quoting *Monia*, 317 U.S. at 427, 63 S.Ct. 409); *see also Gutierrez*, 119 N.M. at 620, 894 P.2d at 397 ( "[T]he constitutional privilege against self-incrimination is available only if it is invoked as the ground for refusing to speak."). Therefore, as a general rule individuals are not deemed to be "compelled" to speak in violation of the Fifth Amendment unless the individual invokes the privilege, *refuses to answer, and is thereafter forced to answer. See Gutierrez*, 119 N.M. at 620, 894 P.2d at 397.

{44} We conclude that the Legislature intended to provide a statutory exception to the general requirement that the child affirmatively invoke the privilege during an investigatory detention in order to be availed of its protection. *See id.* at 621, 894 P.2d at 398 (recognizing that *Miranda* is an "exception[ ] to the general rule that the privilege is not available unless invoked as a ground for refusal to answer"). By enacting Section 32A–2–14, the Legislature intended to shift the burden to law enforcement to remind the child during an investigatory detention that the child has no obligation to answer the officer's questions. In accordance with a child's age, immaturity, and inability to appreciate certain rights available to them, ad-

vising them that they have the right to remain silent simply makes them aware of it. *See, e.g., Miranda*, 384 U.S. at 468, 86 S.Ct. 1602. As a corollary to the advisement of the right to remain silent, we also conclude that under the statute, law enforcement must advise children of the consequences of waiving that right. *See id.* at 469, 86 S.Ct. 1602. Law enforcement must also explain that anything the child says may be used against the child in court. *See id.* "This warning is needed in order to make [the child] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." *Id.*

{45} Even though individuals maintain a right to remain silent when questioned by police during an investigatory detention, individuals do not have a right to have an attorney present during such questioning. There are two constitutional provisions that grant the right to counsel, the Fifth Amendment and the Sixth Amendment, neither one of which attach during an investigatory detention. "The [S]ixth [A]mendment right to counsel does not attach ... until judicial proceedings have been initiated against the suspect, such as by way of indictment or preliminary hearing." *See State v. Chamberlain*, 109 N.M. 173, 176, 783 P.2d 483, 486 (Ct.App.1989). Additionally, the Fifth Amendment right to counsel pronounced in *Miranda* is so intertwined with the coercive pressures inherent in custodial interrogation that the right does not attach until the suspect is subject to custodial interrogation. *See id.*

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the *right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the* interrogation process.... *With a law-*

*yer present the likelihood that the police will practice coercion is reduced,* and if coercion is nevertheless exercised the lawyer can testify to it in court.

*Miranda,* 384 U.S. at 469–70, 86 S.Ct. 1602 (emphasis added). As previously discussed, the circumstances surrounding an investigatory detention are not inherently coercive as they are during custodial interrogation. Consequently, the right to counsel does not attach when an individual is subject to a detention that never escalates to a custodial interrogation.

{46} Moreover, to interpret the term "constitutional rights" in Section 32A–2–14(C) to include the right to counsel during an investigatory detention would present unworkable situations that would greatly infringe on a child's fundamental rights. For example, if an officer was mandated to advise a child that he has the right to counsel during an investigatory detention, which is constitutionally justified only if limited in scope and duration, and the child invokes, the officer would have to further detain the child so that an attorney may be either retained or appointed. This would be a severe infringement on the child's Fourth Amendment rights since a further detention would likely be unlawful under the Fourth Amendment's "reasonable suspicion" requirement. To interpret the term "constitutional rights" to include the right to counsel during investigatory detention would lead to an unreasonable and absurd result. *See State v. Wyrostek,* 108 N.M. 140, 142, 767 P.2d 379, 381 (Ct.App. 1988) ("[A] court will not give a statute a literal reading when to do so leads to absurd and unreasonable results, or requires useless acts.").

{47} Therefore, we find that the term "constitutional rights" in Subsection (C), as it applies to investigatory detentions, refers to the right to remain silent. By enacting Section 32A–2–14, we conclude that the Legislature intended to exempt children from the general rule of self invocation by requiring that children be reminded of their right not to incriminate themselves and be advised of the consequences of waiving that right. Accordingly, we conclude that when a child is subject to an investigatory detention, law enforcement must advise the child of his or her right to remain silent and that if the right is waived anything that the child says can be used against them in any delinquency hearing.

## V.

{48} In the instant case, we agree that the Child's rights under *Miranda* were not violated since the Child was not in custodial interrogation and was, therefore, not entitled to *Miranda* warnings. However, we disagree that Section 32A–2–14(C) is merely a codification of *Miranda*. Instead, we conclude that in enacting Section 32A–2–14(C), the Legislature intended to provide greater protection to juveniles than is afforded to adults in the area of police questioning. As such, we hold that under the Children's Code a child who is detained or seized and suspected of wrongdoing must be advised of his or her right to remain silent and that if the child waives that right, anything said can be used against them. Because Javier M. was subject to an investigatory detention and was not advised by Officer Helton that he had a right not to answer the officer's questions, we conclude that the statements made by Javier M. should have been suppressed pursuant to Section 32A–2–14(D). Since the Children's Court did not suppress the Child's statements, but instead used the statements as the basis for its finding of delinquency, we reverse the Child's adjudication.

{49} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, and PETRA JIMENEZ MAES, Justice.

PAMELA B. MINZNER, Justice, and GENE E. FRANCHINI, Justice (specially concurring).

MINZNER, Justice (specially concurring).

{50} I concur in the result reached by the majority opinion; the Children's Court erred when it did not suppress the Child's statements and we should reverse the Child's adjudication of delinquency. I am persuaded that in enacting NMSA 1978, § 32A–2–14 (1993), the Legislature did not intend only to

codify *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but also intended to grant a further statutory right to a child who is "alleged or suspected of being a delinquent child," to be advised of his or her constitutional rights before being "interrogated or questioned." Section 32A–2–14(C). Therefore, Officer Helton was required by Section 32A–2–14(C) to advise the Child of his constitutional rights prior to questioning him. I write separately because I would reverse the Children's Court without reaching all of the issues addressed by the majority.

{51} Officer Helton testified that he detected the odor of alcohol on the Child, and that in his opinion there was no question that the Child had consumed alcohol. Majority Opinion ¶ 3. Additionally, Officer Helton directly asked the Child whether he had consumed any alcohol, and he confessed that he drank two beers. *Id.* On these facts it seems clear that Officer Helton questioned the Child, whom he suspected to be delinquent. Therefore, under Section 32A–2–14(C), Officer Helton should have informed the Child of his constitutional rights and obtained a valid waiver before any response was admitted at trial. We therefore need not determine in this case whether the warnings required by statute should have been given at an earlier time.

{52} Although it is not necessary in order to decide this case, it might be helpful to propose a test for future cases in which the application of Section 32A–2–14 is less clear. The Child proposed the test of whether the questioning was likely to elicit an incriminating response. That test seems to me to capture the Legislature's intent in enacting Section 32A–2–14(C). That test provides objective proof of the law enforcement officer's subjective state of mind-that is, whether he or she suspects that the Child was delinquent. The majority proposes an alternative query: whether the child is the subject of an investigatory detention. The question of whether the defendant is subject to an investigatory detention, as a midpoint between a full arrest and a purely consensual encounter, is determined by balancing the degree of the intrusion into a person's privacy against the government's interest in investigating and preventing crime. *State v. Jason L.*, 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856. That question has proved difficult to analyze. *See id.* ¶¶ 16–19. The Child's test seems simpler and thus easier for law enforcement to apply; furthermore, it seems more consistent with the text of Section 32A–2–14(C).

{53} The majority expresses concern that the Child's test would unduly hamper law enforcement by requiring warnings prior to questions of a child's age or identity, general on-the-scene questioning, and statements volunteered by the child. Majority Opinion ¶¶ 39–40. I am not convinced that this is the case. The Child's test looks at the officer's question-prior to any response—and asks whether the question itself objectively evinces the officer's suspicion. If it does, Section 32A–2–14(C) requires prior warnings. Thus understood, the Child's test would not unduly hamper law enforcement. The officer can ask the age and identity of a child even though the circumstances of the case may make those questions likely to elicit an incriminating response because, for example, the child is in possession of alcohol. In that case, the sole remedy provided by Section 32A–2–14(D) is suppression of the child's statement in the absence of an informed waiver. The State would be free to prove the child's age by any other means, and the officer could still testify that he or she observed the child drinking. Volunteered statements do not come as a result of questioning and would thus not require warnings under either test. Finally, on-the-scene questioning ordinarily would not seem to evince the officer's suspicion of a child. If it ever did, I believe the Legislature concluded in Section 32A–2–14 that any responses to those questions should be suppressed.

{54} I also am not persuaded we ought to reach the further question of what advice Officer Helton should have provided the Child. We are agreed that the adjudication must be reversed; the parties appear to agree that if notice of constitutional rights was required, that requirement was not satisfied.

{55} Both parties assumed in their briefing that if the Child was entitled to any warnings, it would be the full set required by *Miranda*. It might be helpful to confirm or dispel that assumption, even though it is not necessary in order to decide this case. Because we are concerned with a statutory right to notice or warnings, the answer depends on what the Legislature intended. Considering the relationship between Section 32A–2–14(C) and *Miranda*, it seems natural to assume the full set of *Miranda* warnings is required, regardless of the stage of the encounter.

{56} The Legislature mandated "advising the child of the child's constitutional rights," and did not limit the scope of the advice. Section 32A–2–14(C). *Miranda* itself describes the right to counsel as "a right to consult with counsel *prior to* questioning," as well as the right to "have counsel present *during any questioning* if the defendant so desires." 384 U.S. at 470, 86 S.Ct. 1602 (emphases added). The *Miranda* court clearly tied the right to have counsel present to the right to remain silent: "Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege [against self-incrimination] we delineate today." *Id.* at 471, 86 S.Ct. 1602.

{57} As the majority notes, "a child who is subject to an investigatory detention may feel pressures similar to those experienced by adults during custodial interrogation." Majority Opinion ¶ 37. Because *Miranda* so clearly tied the right to counsel with the right to remain silent, and because the Legislature declared the intent of the Children's Code to hold children accountable for their actions "*to the extent of* the child's age, education, mental and physical condition, background and all other relevant factors," NMSA 1978, § 32A–2–2(A) (1993) (emphasis added), I see no reason to exclude from the warnings given to a child some mention of the child's right to counsel as further protection of the child's privilege against self-incrimination. In advising of the right to counsel under Section 32A–2–14, to be consistent with *Miranda*, an officer would not need to describe the right as a right to counsel at the time the advice is given; the officer, for example, might advise a child that he or she has the right to consult counsel prior to any further questioning.

{58} For the reasons stated above, I respectfully concur in Sections IV(A)(1) and (2), and in the result of Section IV(B). I agree that we should reverse the Child's adjudication. I would do so without reaching the analyses contained in Section III, IV(B) and IV(C).

I CONCUR: GENE E. FRANCHINI, Justice.